STATE of Alaska, Petitioner,

v.

Mary Lynn STUMP, Respondent.

No. 2663.

Supreme Court of Alaska.

March 22, 1976.

---

Avrum M. Gross, Atty. Gen., Juneau, Joseph D. Balfe, Dist. Atty., and Stephen G. Dunning, Asst. Dist. Atty., Anchorage, for petitioner.

Brian Shortell, Public Defender, Barbara J. Miracle, Asst. Public Defender, and Peter F. Mysing, Legal Intern, Anchorage, for respondent.

Before BOOCHEVER, Chief Justice, CONNOR, ERWIN and BURKE, Justices, and DIMOND, Justice Pro Tem.

## OPINION

ERWIN, Justice.

We granted review of this case to decide whether an order by the trial court suppressing evidence was proper under the circumstances.

■ Respondent Mary Lynn Stump was indicted for possession of cocaine.[1] Her pre-trial motion to suppress was granted[2] and the State of Alaska petitioned for review.[3] Since the order of the trial court

1. AS 17.12.010 prohibits the possession or sale of a depressant, hallucinogenic, or stimulant drug.

2. Alaska R.Crim.P. 37(c).

3. "[T]he state can invoke our discretionary review jurisdiction in criminal cases where the matter sought to be reviewed involves a non-final order or decision of the superior court." *State v. Browder*, 486 P.2d 925, 931 (Alaska 1971). See *State v. Davenport*, 510 P.2d 78, 80 (Alaska 1973).

would likely result in terminating the prosecution[4] and involves a controlling question of law,[5] review by this court is appropriate.

For purposes of this appeal, the factual summaries of either side do not vary in material regard. In the early morning hours of April 25, 1975, Investigator Harter of the Alaska State Troopers was awakened by a telephone call from his office directing him to contact Victor Gedminas, the Assistant Manager of Western Airlines Freight at Anchorage International Airport. When Harter called Gedminas, he was informed that a Western Airlines employee, William Krossa, had discovered some white powder in a package of T-shirts.

In the course of his duties, Krossa occasionally opened packages shipped by Western Airlines in order to determine that their contents were as described on the accompanying air bills. Prior to his involvement with the case at bar, Krossa had never found unlawful drugs in a package he inspected. Although he had on occasion discovered other items which were not supposed to be shipped by air, he had had no past dealings with police officers with regard to these items. On the day in question, Krossa's attention was drawn to a package wrapped in brown paper addressed to Dick York in care of respondent, Mary Stump. It had been shipped from San Francisco and was accompanied by an air bill stating its contents as "T-shirts." The method of collecting payment was unusual, and, on the day of its arrival, Krossa received between four and eight telephone calls from a man and a woman inquiring

whether the package had come in. Also, Krossa had been informed by a co-worker that a few days before, the package's recipients had shipped a book upon which they had placed an unusually high value to an address in San Francisco.

These facts caused Krossa to suspect that the contents of the package might not be as described, and he therefore opened it for inspection. Krossa found that the package did indeed contain T-shirts. In addition, however, he discovered two plastic bags of a powder-like substance taped to the inside of one of the shirts. Krossa suspected that the substance was either cocaine or heroin. With the plastic bags still taped to the inside of the T-shirt, Krossa repackaged the goods in their original box, leaving the end open.

When Investigator Harter subsequently met with Krossa at the airport, he was shown a box wrapped in brown paper which had one end cut off. Krossa thereupon removed the contents of the box and showed Harter the T-shirt which contained the plastic bags. At that point Harter reached inside the T-shirt and removed the plastic bags. Some of the white powder reacted positively to a field test for cocaine.

The trial court found that the search of the package was conducted in conjunction with or at the direction of the police and that no exception to the prohibition against warrantless searches and seizures was applicable under the circumstances. Hence, the trial judge concluded that the search was unlawful and the evidence subject to suppression.

■ There are two separate components of the search[6] which must be analyzed in

---

4. Alaska R.App.P. 23(c)(1) allows the filing of a petition for review when an order affects a substantial right which " . . . in effect terminates the proceeding or action and prevents a final judgment therein . . . ."

5. Alaska R.App.P. 23(d) permits the filing of a petition for review when a controlling question of law is involved.

6. The fourth amendment to the United States Constitution provides:
   The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

order to rule on the search and seizure issue: (1) the initial inspection by Krossa; and (2) the later inspection by Krossa and Investigator Harter. Since no search warrant was obtained, the State has the burden of proving that the search in question met constitutional requirements.[7]

█ We begin with the initial inspection of the package by Mr. Krossa. At the time of the search, Krossa was acting in a purely private capacity, not as an agent of the police. There was no evidence that he had cooperated with the police in the past or had any previous contact with them pertaining to drug detection.[8] As this court stated in *Bell v. State*, 519 P.2d 804, 807 (Alaska 1974).

A search by a private citizen not acting in conjunction with or at the direction of the police does not violate the constitutional prohibitions against unreasonable search and seizure.

*Id.* at 807, *citing Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed.

1048, 1051 (1921), and other federal authorities. Hence, the search by Krossa did not violate Stump's constitutional rights.[9]

█ Turning to the second inspection, we note that after Krossa discovered the powder,[10] he called the police. He then repackaged the goods in their original box with the end cut off.[11] When Investigator Harter arrived, Krossa removed a T-shirt from the box[12] and showed Harter the plastic bag[13] containing the powder. Harter then took the bag and tested the powder. It reacted positively for cocaine.

We are not persuaded that this inspection stands on any different footing than the first inspection. There is no indication it was done at the direction of the police, nor was there an attempt by the officer to open the original package. Investigator Harter was handed a T-shirt from a box opened by Krossa, and the powder contained in plastic bags was pointed out to him. No police search had occurred up until this time. There was no "prying into hidden

---

The Alaska Constitution, Art. I, Sec. 14, provides:

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

7. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971); *Bell v. State*, 519 P.2d 804, 806 (Alaska 1974).

8. Thus we are not confronted with the situation involved in *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966), where government agents initiated and participated in a search of air cargo by TWA employees.

9. We note that respondent concedes the legality of the initial intrusion by Krossa. (Respondent's Brief at 7).

10. According to Krossa, the plastic bags were "cellophane," not opaque, and he could see they contained a brownish-gray powder. (Tr. 15)

11. The box was 14″ × 14″ ×2½″ and was wrapped in brown paper.

12. The exact testimony was a follows:
   Q. Okay, and the contents were in the box?
   A. He—apparently he had put them back in after he had checked them before I got there.
   Q. Okay. And he took them out again for your observation?
   A. Yes, ma'am.
   Q. Okay. And the—he had not removed the items from inside the T-shirt?
   A. No, they were still taped to the inside of the T-shirt.
   Q. Okay. And he removed them from the T-shirt?
   A. I did.
   Q. You removed them from the T-shirt? You also took them out of the box?
   A. You just asked me that.
   Q. Was it you or him, I'm sorry.
   A. He removed them from the box, showed me the plastic bag taped to the back of the shirt. I removed the bag from the shirt. (Tr. 29–30).

13. Actually there were two smaller "cellophane" bags inside a larger bag which formed an outer covering.

places for that which is concealed"[14] by the officer, and thus the contraband was in plain view. Hence, the second inspection was permissible[15] and the subsequent seizure justifiable.[16]

The decision of the trial court dated August 29, 1976, is reversed, and this case is remanded for further proceedings in conformity with this opinion.

RABINOWITZ, J., not participating.

DIMOND, Justice Pro Tem. (dissenting).

I cannot agree with the majority opinion in this case. My disagreement on the search issue centers on the conclusion that "no police search . . . occurred" when the T-shirts were removed from the package the second time.

When Investigator Harter arrived at the airport, he was shown a box wrapped in brown paper with one end cut off. There was no contraband in sight. William Krossa, an airline employee, informed Harter that inside one of the T-shirts in the box was a plastic bag containing two plastic bags of white powder.[1] Krossa then removed the contents from the box. While the record is devoid of any indica-

tion that Harter directed Krossa to remove the package's contents, I think it is evident that but for the presence of the police, the contents of the package would not have been removed by Krossa at that time. In my opinion, the surrounding circumstances indicate that Krossa was "acting in conjunction with or at the direction of the police,"[2] i. e., he was acting as an agent of the police and not as a private citizen when he removed the contents of the package in Officer Harter's presence.

In *Schraff v. State,*[3] this court, citing *Weltz v. State,*[4] reiterated the following definition of the term "search":

A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a "search." (footnote omitted)

Prior to the second inspection, the powdery substance was concealed from Harter's view; as far as he was concerned, the substance was in a hidden place. Therefore, when Krossa inspected the package's contents for the second time, he was conduct-

14. *Brown v. State,* 372 P.2d 785, 790 (Alaska 1962).

15. See *U. S. v. Blanton,* 479 F.2d 327 (5th Cir. 1973) ; *Wolf Low v. United States,* 391 F.2d 61 (9th Cir. 1968) ; *United States v. Hodges,* 448 F.2d 1309 (6th Cir. 1971).

16. The dissent contends that the seizure was not justified. In this regard see *Daygee v. State,* 514 P.2d 1159, 1162–1163 (Alaska 1973), where we said, "[i]t is not necessary that the contraband be positively identified before it is seized." (Footnote omitted). Also see *Bell v. State,* 519 P.2d 804, 808 (Alaska 1974), where this court, citing *Daygee,* made the following observation:

While Jones [a government employee] did not positively declare that he believed the substance was marijuana, it strains credulity to conjure some other identification for this material found in a carton shipped as "clothing". Admittedly it could have been hay, tea or spices, but officers are not required to eliminate every far-fetched

conjectural hypothesis before seizing an item as contraband.

Here, also, the manner of shipment, the concern shown by the addressees over the "T-shirts," the method of packaging, and the material's appearance do not allow any reasonable inference that the bags did not contain contraband.

1. Krossa had testified that the powdery substance "looked kind of brownish through the bag—brown gray."
(Alaska 1974), where this court stated:

2. See *Bell v. State,* 519 P.2d 804, 807 (Alaska 1974), where this court stated:
A search by a private citizen not acting in conjunction with or at the direction of the police does not violate the constitutional prohibitions against unreasonable search and seizure.

3. 544 P.2d 834 (Alaska 1975).

4. 431 P.2d 502, 505 (Alaska 1967).

ing a "search" for police purposes. Since Krossa was not then acting as a private citizen, the protections guaranteed by the fourth amendment and the state constitution were applicable.[5] In view of the fact that no warrant was obtained in this case and no exception to that requirement is present under the circumstances, I would affirm the superior court's suppression of the contraband evidence on the ground that there was an illegal search.

Even if I were to agree with the majority's position with respect to the search issue, I would still differ from the decision ultimately reached by the court. My disagreement is based on the majority's finding that Investigator Harter's seizure of the contraband was authorized under the plain view exception to the search warrant requirement.

Justice Boochever (now Chief Justice), in writing the majority opinion in *Bell v. State*,[6] stated:

Although inferential reasoning rather than direct sight of the contraband itself has often been held sufficient to justify a "plain view" seizure of a package containing contraband, courts have not articulated the standard of certainty of the presence of contraband required when the state seeks to justify a seizure partly upon plain sight of an object and partly upon reasoning as to the contents of the object.[7]

Whatever that standard of certainty is, I believe it was not met here. In *Daygee v. State*, 514 P.2d 1159 (Alaska 1973), we sustained a seizure of contraband (marijuana) in plain view because of evidence that the police officer involved had extensive training in detecting marijuana, had testified that he recognized the smell of marijuana burning and that the substance in the bag in his view looked like marijuana, which he had seen previously.[8]

But we have no such evidence here. Officer Harter testified only that he was a narcotics investigator. There was no testimony or other evidence that he had extensive training in detecting cocaine and that because of certain elements peculiar to that drug, he recognized the powdery substance in the plastic bags as being cocaine, or some other illicit drug. His suspicions were undoubtedly aroused by the presence of the plastic bags in the T-shirts, but a plain view of simply suspicious looking objects does not justify their seizure without a warrant.[9]

In *Bell v. State,* the court held that:

. . . [C]lear and convincing evidence of the nature and presence of contraband within the package, such as Jones had, is sufficient to sustain a "plain view" seizure. We do not decide whether some lesser standard, such as probable cause, would suffice; such a discussion is not material to the outcome of this case, and the parties have not briefed or argued the question.[10]

There was no such "clear and convincing evidence" until after Harter had re-

---

5. The fourth amendment to the United States Constitution provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
   The Alaska Constitution, art. I, § 14, provides:
   The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated.

No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

6. 519 P.2d 804 (Alaska 1974).

7. *Id.* 519 P.2d at 808 n. 13.

8. *Daygee v. State*, 514 P.2d 1159, 1162–63 (Alaska 1973).

9. *People v. Marshall*, 69 Cal.2d 51, 442 P.2d 665 (1968).

10. *Bell v. State*, 519 P.2d 804, 809 n. 13 (Alaska 1974).

moved the plastic bags from the T-shirts, which was a seizure, and had conducted a field test for cocaine, which was positive. In fact, Harter seems to admit that he did not know what was in the plastic bags until after the field test was conducted. At one point in the transcript of record, he stated that he "seized the package based on the fact that it did contain contraband" and then took it to a laboratory for chemical analysis. Even though Harter used the word "seized" with respect to his taking the plastic bags to the chemical laboratory, he had actually seized the bags previously when he removed them from the T-shirts and conducted the field test.

In my opinion, Officer Harter's seizure of the plastic bags was totally unauthorized and unreasonable. A search without a warrant is per se unreasonable unless it falls within one of the narrowly defined exceptions to the warrant requirement.[11] This applies to governmental seizures also, because the constitutional provisions we are concerned with prohibit not only unreasonable searches, but also unreasonable seizures as well.

The exceptions to the requirement for a warrant are "jealously and carefully drawn", and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it. . . ." *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971).

The only exception that could conceivably apply here is that there may have been imminent destruction or concealment of *known* evidence.[12] But such an argument is hardly convincing. It was 2:30 a. m. when Officer Harter met Krossa at the airport and saw the plastic bags. The

chance that the consignee of the package would appear during such early morning hours to pick the package up while Harter had gone to get a search warrant are extremely remote. This is particularly true in view of the fact, according to Krossa's testimony, that he had had several calls about the package the day before and had told the caller that the package had not arrived.

Furthermore, this exception, if it would apply, relates to "known" evidence. As I have pointed out, there was no evidence that Harter knew what the plastic bags contained until after he had seized them without a warrant and conducted a field test which indicated the presence of cocaine. The state had the burden of proving the existence of exigent circumstances that would justify a seizure without a warrant.[13] In my opinion, it did not meet that burden.

Keeping in mind that the practicalities of law enforcement must be examined when we review the conduct of police officers, the state might argue that to expect Officer Harter to get a warrant at 2:30 or 3:00 o'clock in the morning would be unreasonable. I would reject the view that the police are excused from seeking a warrant because the hour is early, or late, and that they will have difficulty in finding a judge or magistrate to issue a warrant. The vital protections of the fourth amendment and art. I, sec. 14 of the Alaska Constitution cannot be hinged upon the convenience of police and magistrates or judges.[14]

Being a narcotics investigator, Harter may have believed that what he·saw in the plastic bags may have been cocaine. But there is a difference between belief, or even probable cause to believe, that what the officer saw in the plain view was

11. *Erickson v. State,* 507 P.2d 508, 514 (Alaska 1973).

12. *Id.* 507 P.2d at 515.

13. *Bell v. State,* 519 P.2d 804, 806 (Alaska 1974).

14. *McDonald v. United States,* 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153, 158 (1948); *People v. Marshall,* 69 Cal.2d 51, 442 P.2d 665, 671 (1968).

contraband, which would be the basis for securing a warrant, and clear and convincing evidence that what he saw was contraband—an illicit drug—which would have justified his seizure of the drug without a warrant. As the United States Supreme Court has pointed out:

> The point of the Fourth Amendment, which often is not grapsed by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer in the often competitive enterprise of ferreting out crime.[15]

The foundation of the constitutional guarantees against unreasonable searches and seizures is the right to privacy.[16] This right is so important that it was deemed unwise to leave it to the discretion of the police whether one's privacy need be invaded in order to enforce the law. A magistrate or judge has been interposed between the police and the person in order that an objective mind might weigh the need for intruding upon a person's privacy. Before privacy may be invaded, a warrant permitting a search and seizure, based upon probable cause and supported by an oath or affirmation, must be issued by a neutral and detached magistrate or judge.[17]

One's right to privacy is recognized not alone in the constitutional prohibitions against unreasonable searches and seizures in the fourth amendment to the federal constitution and in art. I, sec. 14 of the Alaska Constitution. In 1972, the people of Alaska added to our constitution sec. 22 of art. I which provides:

> The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

This addition to our constitution has the effect of removing whatever doubt may have existed regarding the precious nature of the individual's right to privacy. It has the effect, in my opinion, of requiring that in the area of searches and seizures, for example, the law must be construed most liberally in favor of the individual and most strictly against the government, in order to effectuate the constitutional mandate that the right to privacy of the people shall not be infringed.[18]

The majority opinion in this case has the ultimate effect, I believe, in creating a presumption that evidence to support a magistrate's or judge's disinterested determination to issue a warrant will also justify a police officer in making a seizure without a warrant. This would certainly reduce the very explicit constitutional protections of privacy of the people to a nullity, and would leave one's person and his property secure only in the discretion of police officers.[19]

15. *Chapman v. United States,* 365 U.S. 610, 614–15, 81 S.Ct. 776, 778–779, 5 L.Ed. 828, 832 (1961); *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948); *People v. Marshall,* 69 Cal.2d 51, 442 P.2d 665, 668 (1968).

16. *Fresneda v. State,* 458 P.2d 134, 138 (Alaska 1969).

17. *Chimel v. California,* 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685, 693 (1969).

18. *See Smith v. State,* 510 P.2d 793, 799 n. 2 (Alaska 1973) (dissenting opinion of Chief Justice Rabinowitz).

19. *See Chapman v. United States,* 365 U.S. 610, 615, 81 S.Ct. 776, 779, 5 L.Ed.2d 828, 832 (1961); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948); *People v. Marshall,* 69 Cal.2d 51, 442 P.2d 665, 669 (1968).