Burr SNYDER, Appellant,

v.

STATE of Alaska, Appellee.

No. 3321.

Supreme Court of Alaska.

Oct. 13, 1978.

William H. Fuld, Kay, Christie, Fuld & Saville, Anchorage, for appellant.

James V. Gould, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

## OPINION

BOOCHEVER, Chief Justice.

Appellant Burr Snyder, convicted on state drug charges, challenges his conviction on the grounds that the search by an airline employee of packages shipped from Los Angeles to Anchorage was unconstitutional under the fourth amendment of the United States Constitution and the similar provisions of art. I, sec. 14 of the Alaska Constitution. The trial court found that the search by the airline agent did not violate constitutional provisions. Snyder also challenges his sentence as being excessive. We affirm the conviction but remand for resentencing.

On July 23, 1976, two individuals delivered a trunk and a box described as "personal effects" to an airline freight agent at the Los Angeles International Airport. The two packages weighed 143 pounds. The box and footlocker were accepted for shipment to Anchorage by an airline customer service representative named Terry Powledge.

Powledge became suspicious of the packages and cut open the box with a pocket knife, finding a large plastic bag sealed with electrical tape. He unraveled the tape of that bag and another similar bag inside it, exposing square-shaped objects containing a "hay-like" substance, which he concluded were "bricks" of marijuana.

Powledge, who planned to attend law school and considered working in a district attorney's office, had called the police at least 12 times previous to this incident to report his discovery of drugs in goods shipped with the airline. This behavior apparently originated after a visit to the airline by members of the Airport Detail, Administrative Narcotics Division of the Los Angeles Police Department. At that visit, the employees were asked to call the state police if they discover narcotics. The police informed the employees that police officers themselves could not open packages without a warrant but that, under Civil Aeronautics Board rules, airline employees have a right to open packages if they have reason to believe that something is wrong or that the items listed on the airbill do not accurately represent what in fact is in the parcels.

Powledge had testified on several instances in trials resulting from his drug discoveries, receiving travel expenses as well as his normal day's pay. He had received a commendation from the Los Angeles police for his discoveries, but his efforts apparently resulted in no direct financial benefits. The trial court concluded that the airline management "did not appear to encourage Powledge in his efforts to search out drug shipments."

Powledge testified that his suspicions were aroused because one of the two individuals seemed nervous and had positioned himself where he could observe everyone who entered the area. He noticed a "strong perfumed odor" coming from the package. Additionally, the packages were given a return address to an "E" Street in Los Angeles, a street Powledge said he thought did not exist. Powledge also noticed the name of the sender was spelled

"Snider"; and, as he had never seen that spelling before, he concluded that the person was deliberately misspelling his name.[1]

The investigating officer testified that, when he arrived at the terminal, the bricks of marijuana were "in plain view" but that he removed the bricks from the package in order to count them. The officer counted 67 kilo bricks and performed a field test which he said reacted positively for marijuana. He subsequently removed 17 of the bricks and resealed the trunk and packages, which were sent on to Anchorage.

When the parcels arrived in Anchorage on July 24, a police agent, disguised as an airline employee, delivered the packages to two women. The women drove away with the packages, picked up appellant Burr Snyder and proceeded to storage lockers where the Alaska police arrested Snyder.

Snyder moved to suppress the bricks seized on the theory that Powledge acted only to uncover drugs for police purposes rather than for the benefit of the airline and that this purpose brought his actions within the prohibitions against unreasonable searches and seizures. The judge denied the motion to suppress. Snyder was found guilty of possession of marijuana for the purpose of sale or distribution, a violation of AS 17.12.010, and was sentenced by the court to serve five years. He has filed a timely appeal.

## THE AIRLINE INSPECTION

■ It is generally recognized that airline employees have authority to search packages for the purpose of discovering contraband or inaccurately-declared contents.[2] On three occasions, we have held that searches by airline employees, acting for an independent and legitimate airline purpose and not in conjunction with or at the direction of the police, do not violate constitutional prohibitions against unreasonable search and seizure.[3]

This case differs from the factual situations previously presented to us, however, in that the police in this case had advised the airline employees as to the latter's right to search; and Powledge had previously discovered drugs and cooperated with law enforcement officials. There is no contention, however, that the police requested a specific search of Snyder's package or participated in the initial discovery of the contraband.

The California Supreme Court addressed the specific issue of police advice to airline employees of their right to search in *People v. McKinnon,* 500 P.2d 1097 (Cal.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1891, 36 L.Ed.2d 390 (1973). After discussing independent airline purposes justifying an inspection, that court set forth some guidelines for the factual determination of whether the airline employee acted as an agent of the police.

1. Powledge also said that the vehicle in which the two men arrived was parked in "an odd manner" in front of the terminal. He noted the license number and description of the car before it drove away.

2. "Airport Freight and Passenger Searches: Application of Fourth Amendment Standards," 14 Wm. & Mary L.Rev. 953, 961 (1973), states:
There is no dispute that an airline inspection undertaken at the initiative of airline employees, for independent airline purposes, and without government participation, is a private search and is not subject to the requirements of the fourth amendment. Independent airline purposes for such inspections apparently include detection of insurance frauds, detection of rate cheating through improper declaration of contents, ensuring that airline facilities are not being used in the commission of a crime, protection of the aircraft and other freight, identification of the owner of unclaimed luggage, and the insulation of the airline from criminal liability for transporting certain items. (footnotes omitted)
*See United States v. Echols,* 348 F.Supp. 745, 748 (E.D.Mo.1972), *aff'd,* 477 F.2d 37 (8th Cir.), *cert. denied,* 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973); *United States v. Averell,* 296 F.Supp. 1004, 1010 (E.D.N.Y.1969); *People v. McKinnon,* 500 P.2d 1097, 1105–06 (Cal.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1891, 36 L.Ed.2d 390 (1973); *State v. Larko,* 280 A.2d 153, 155 (Conn.App.1971).

3. *Stange v. State,* 559 P.2d 650, 653 (Alaska 1977); *State v. Stump,* 547 P.2d 305, 307 (Alaska 1976); *Bell v. State,* 519 P.2d 804, 807 (Alaska 1974).

First, it is evident that the conduct of an airline employee who was hired and paid by the police to search any and all suspicious packages in the hope of finding evidence of crime would be judged by Fourth Amendment standards. . . . The same would be true of the conduct of an airline employee who, although not in the actual hire of the police, nevertheless participated in planning and implementing a "joint operation" within law enforcement authorities for the purpose of obtaining incriminating evidence against a specific person. . . . And even though he had no prior arrangement with the police, an airline employee would be deemed to act as an agent thereof if he were to open and search a specific package at the express direction or request of law enforcement authorities. (citations omitted) *Id.* at 1106.

■ Powledge was not hired or paid by the police, was not involved in a "joint operation" with the police and did not open the specific package at the express direction or request of law enforcement authorities. He was performing his duties as a private employee of a private company in opening the package received under circumstances reasonably arousing suspicion. We agree with *McKinnon* that an airline employee, like other citizens, has the right, indeed the duty, to refuse to allow the use of private airline services for criminal purposes.[4] The prior contact, of a general nature, between the state police and airline employees did not cause the employees to become agents of the police. The zealous citizen does not subject his activities to the requirements of the fourth amendment and art. I, sec. 14 of the Alaska Constitution. While the facts of this case approach the outer limits of permissible police involvement, we conclude that Powledge's conduct did not constitute governmental activity.[5]

■ Snyder also invokes another reason for suppressing the evidence that we have not previously addressed. A 1977 decision of the United States Court of Appeals for the Ninth Circuit, *United States v. Fannon,* 556 F.2d 961, 964 (9th Cir. 1977), has held that a search of a package by airline employees is subject to the limitations of the fourth amendment by virtue of the Air Transportation Security Act.[6] The Act authorizes air carriers to condition transportation on a consent to search for the purpose of determining the presence of a "dangerous weapon, explosive or other destructive substance."[7] The three-judge panel held that the statute created a governmental function so as to subject the employees' activities to constitutional limitations. The court held that "Congress supplanted whatever common law power of search air carriers may have had and subjected such searches to the Fourth Amendment's standard of reasonableness." *Id.* at 965.[8] A rehearing *en banc* has been granted, and arguments were heard on June 13, 1978.

The United States Court of Appeals for the Sixth Circuit has not followed *Fannon,*

---

**4.** *People v. McKinnon,* 500 P.2d 1097, 1107 (Cal.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1891, 36 L.Ed.2d 390 (1973).

**5.** In so holding, however, we do not mean to imply that any evidence acquired through a nongovernmental airline inspection is invariably admissible. Common to this case and those we have previously considered in this area is the presence of a legitimate airline purpose justifying the intrusion by the airline employee. In *Stange v. State,* 559 P.2d 650, 652–53 (Alaska 1977), a carton was opened for the purpose of ascertaining the identity of the consignee where no address appeared and the packages remained unclaimed for several days. In *State v. Stump,* 547 P.2d 305, 306 (Alaska 1976); *Bell v. State,* 519 P.2d 804, 806–07 (Alaska 1974); and the present case, we have been presented with reasonable and articulable suspicions on the part of the airline employee that the articles were mislabeled or that they contained contraband. As in *Bell,* 519 P.2d at 807 n.9, we again do not reach the issue of a baseless airline employee search or one conducted merely on personal whim.

**6.** P.Law 93–366, Title II, 88 Stat. 415 (1974).

**7.** This provision is codified in 49 U.S.C. § 1511 (1974).

**8.** *See United States v. Davis,* 482 F.2d 893, 904 (9th Cir. 1973), which applied the fourth amendment to searches of carry-on luggage by virtue of the federally-supported program of searches of all passengers.

stating in *United States v. Freeland,* 562 F.2d 383, 385 (6th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977):

[W]e do not believe that all searches of passengers' luggage at airports are invariably subject to the proscription of the Fourth Amendment. Rather, the question of governmental involvement in the search is determined by the particular facts at hand.

In the present case, there is no indication that Powledge's search was for weapons, explosives or other destructive substances, and we do not believe that the statutory authority to search for such substances automatically causes searches for other airline purposes to be governmental activity.[9]

The argument that federal regulations authorizing searches by air carriers necessarily bring such searches within the fourth amendment, an argument analogous to that made in *Fannon,* has been rejected by the United States Court of Appeals for the District of Columbia in *United States v. Pryba,* 163 U.S.App.D.C. 389, 396–97, 502 F.2d 391, 398–99 (1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975). The court found that the airline's privilege of inspecting suspicious goods existed independently of the Civil Aeronautics Board regulation[10] as a common law right to safeguard life and property. It added that "the frustration of criminal activity is likewise a worthy carrier endeavor."[11]

In *People v. DeSantis,* 59 A.D.2d 257, 399 N.Y.S.2d 514, 516 (N.Y.App.1977), the New York court held that searches by an employee of a common carrier in pursuit of private interests of the carrier were not constitutionally proscribed. The opinion recognized the contrary holding of *Fannon* but did not follow it.

Similarly, in *United States v. Edwards,* 443 F.Supp. 192, 199 (D.Mass.1977), the court disagreed with the holding in *Fannon.* A Los Angeles airline employee initially opened a package because of his fear, arising out of the suspicious conduct of the sender, that it might contain hazardous materials such as flammables or explosives. The court held that the search was not an effort to foil a possible hijacking and thus did not come under the scope of the Air Transportation Security Act. Judge Tauro outlined the history of that Act, indicating that its primary purpose was to deal with air piracy, not shipment of air freight by non-passengers.[12]

■ Here, particularly since there is no evidence that Powledge's search was aimed at discovering weapons, explosives or other destructive substances, we hold that it was not made pursuant to the Air Transportation Security Act; and we are not persuaded by *Fannon* to consider the search to be governmental activity.[13]

The conviction is affirmed.

## THE SENTENCE

Snyder was sentenced to five years imprisonment. He was 25 years old and had no prior criminal record other than traffic

---

9. *See* 14 Wm. & Mary L.Rev., *supra* Note 2 at 961.

10. The court quoted C.A.B. Regulation 96, Rule 24:

All shipments are subject to inspection by the carrier, but the carrier shall not be obligated to perform such inspection. *Id.* at 398 n.45.

11. *Id.* at 399 (footnote omitted). This case arose before the enactment of the Air Transportation Security Act of 1974.

12. The court reasoned:

Common sense dictates that seizure of an aircraft requires the presence on board the carrier of the person attempting to gain control of the plane. To that extent, shipment by air freight, even of an explosive, does not present a threat of hijacking or air piracy. *Id.* at 199.

13. Other contentions were cursorily raised by Snyder pertaining to an expectation of privacy in a closed shipping container and to a temporary seizure by the Anchorage police when the parcel arrived in that city. As pointed out by the state, neither of these arguments was adequately briefed for our consideration. Snyder did not reply to the state's allegations. We consider the issues to be abandoned and decline to pass on them for those reasons. *See* Appellate Rule 11(b)(1)[g].

offenses. The trial court evaluated the case according to the standards outlined in *State v. Chaney,* 477 P.2d 441, 444 (Alaska 1970). The court found that there was no need for assistance in education, vocational training or psychiatric or psychological problems and that Snyder did not require rehabilitation for such purposes. With reference to the goals of deterrence of the defendant and others, the court noted the substantial financial motive for the crime. We note that we are not here dealing with a case where an informer inveigles an individual to secure a small quantity of a drug for sale to the informer at little or no profit. This was a major financial venture involving a total investment of $22,000.00, $6,000.00 of which was from Snyder, according to the probation report. With large profits to be anticipated,[14] a substantial penalty may reasonably be necessary to serve as a deterrent.

The trial court found that there was a substantial likelihood that Snyder would repeat the offense if only given probation.

We have rated marijuana offenses as among the least serious of drug offenses in *Waters v. State,* 483 P.2d 199, 201 (Alaska 1971). By virtue of the quantity involved, however, the present offense must be considered as among the more serious in its category. Under AS 17.12.110(b)(1), the maximum punishment for the first conviction of possession of drugs for the purpose of sale is by imprisonment for 25 years or a fine of $20,000.00 or both.

We note that the first offense of possession for purposes of sale of a narcotic drug is punishable by a fine of not more than $5,000.00 or imprisonment for not less than two nor more than 10 years. AS 17.10.-200(a). Grave questions would be presented if a sentence for violation of AS 17.12.010, at least as far as a marijuana offense is concerned, exceeded those limitations.

We agree with the trial court that, as a deterrent, a reasonable period of imprisonment is required. We are troubled, however, by the court's reasoning in reaching the length of sentence imposed. The court indicated that, because there was little community condemnation of persons involved in the sale of marijuana, a more significant sanction would be required. The discussion was part of the court's consideration of the necessity of a jail term as a deterrent to Snyder and others of similar mind. In the portion of the judge's oral opinion discussing community condemnation in connection with reaffirmation of societal norms, the court stated:

> [W]e have a division in the community. On one hand, a substantial number of people consider the law to be a bad law.

■ Community condemnation of the offender, and, in other words, reaffirmation of societal norms, is one of the sentencing goals set forth in *Chaney.*[15] If an offense is one which society does not strongly condemn, that factor should not be considered as a reason for imposing a more severe sentence.

In view of Snyder's involvement in marijuana traffic for large profits, we believe the goals of deterrence require incarceration here. We are not certain, however, that the trial court would have imposed the 5-year period of incarceration if the goal of community condemnation of the offender had not been improperly considered. The court might well otherwise have imposed a lesser time to serve, with a portion of the sentence suspended under terms of probation.

The length of the sentence also must be considered as involving the type of placement likely to ensue. A sentence of 5 years will in all probability dictate that Snyder be incarcerated with hardened criminals in a facility dominated by security requirements. A lengthy term served under such

---

14. According to the probation report, Officer Needham conservatively placed the street value of the drug at $113,000.00.

15. 477 P.2d at 444. *See also, Smothers v. State,* 579 P.2d 1062, 1064 (Alaska 1978).

conditions may well alter for the worse this first offender whom all recognize to have considerable potential for a responsible law-abiding life.

While we agree that this offense cannot be treated lightly and that incarceration is required, we shall remand for resentencing.

MATTHEWS, J., filed a separate opinion in which CONNOR, J., joined.

BURKE, J., dissents in part.

MATTHEWS, Justice, filing a separate opinion in which CONNOR, Justice, joining.

I agree with the opinion of the Chief Justice concerning the search, and with much of the opinion concerning the sentence. However, I believe that the sentence is excessive.

This court noted in *Ravin v. State*, 537 P.2d 494 (Alaska 1975), that marijuana is a relatively harmless substance, "far more innocuous in terms of physiological and social damage than alcohol or tobacco," *Id.* at 506, and held that an adult has a constitutional right to consume it at home. Of the four categories of drug offenses first identified in *Waters v. State*, 483 P.2d 199, 201 (Alaska 1971), marijuana offenses are the "most innocuous", *Salazar v. State*, 562 P.2d 694, 696 (Alaska 1977), and sentences for them should fall "on the short end of the spectrum." *Id.* The categories are, in descending order of gravity:

(1) smuggling or sale of large quantities of narcotics, or possession of large quantities for sale,

(2) smuggling or sale of small quantities of narcotics, or possession of small quantities for sale,

(3) possession of narcotics without intent to sell,

(4) marijuana offenses.[1]

Following the lead of the American Bar Association, we have often said that five years is the maximum prison term which should be prescribed for all but "particularly serious offenses, dangerous offenders and professional criminals."[2] Less than a year ago we held that a twice convicted seller of heroin did not fall within the exceptional category which justifies a sentence longer than five years. *Huff v. State*, 568 P.2d 1014 (Alaska 1977).[3] Thus, our recent decisions indicate that the maximum term of imprisonment for the most serious of drug crimes, the sale of heroin, should not exceed five years, except in extraordinary cases. Since marijuana offenses are at the bottom of the drug crime scale, a five year sentence for a first offender cannot be justified. Sustaining this sentence would be a denial of the principle that the sentence should fit the crime.[4]

I would vacate the sentence as excessive and remand for resentencing.

BURKE, Justice, dissenting in part.

In my opinion, Snyder's five-year sentence was neither excessive[1] nor based

1. We have recently reaffirmed our adherence to this gradation of drug offenses in *Huff v. State*, 568 P.2d 1014, 1017 (Alaska 1977) and *Salazar v. State*, 562 P.2d 694, 696 (Alaska 1977).

2. *Huff v. State*, 568 P.2d at 1020; *Salazar v. State*, 562 P.2d at 697; *State v. Trannel*, 549 P.2d 550, 552 (Alaska 1976); American Bar Association Standards, Sentencing Alternatives and Procedures, § 2.1(d) (approved draft 1968).

3. In *Huff* we held that the defendant should not receive concurrent sentences of more than four

years, even though he had a prior felony record.

4. In *Hansen v. State*, 582 P.2d 1041 (Alaska 1978), we recognized the need to grade down from the American Bar Association five year maximum term.

1. Justice Matthews, joined by Justice Connor, would hold that Snyder's sentence was excessive because the drug involved was marijuana. This view, I believe, ignores both the magnitude and commercial nature of the transaction, as well as the extent of the sentence authorized by the legislature.

upon an improper consideration of the need for community condemnation.[2]  Thus, I would affirm the superior court's judgment in all respects.

2. The Chief Justice, joined by Justice Rabinowitz, while apparently not convinced that the sentence was clearly excessive, feel that resentencing is necessary because they are "not certain . . . that the trial court would have imposed the 5-year period of incarceration if the goal of community condemnation of the offender had not been improperly considered."

In reaching that conclusion, I believe they have taken Judge Singleton's remarks, concerning community condemnation, entirely out of context.  Overall, I think the record reflects that Judge Singleton gave careful and proper consideration to all of the appropriate goals of sentencing.